Thompson, J.
delivered the opinion of the Court.
The prisoner was indicted for the murder of his wife, in the Circuit court of law for the county of Henrico, on the 17th of April 1851. The jury empanneled and sworn for his trial found him guilty of murder in the second degree, and by their verdict assessed the term of his imprisonment in the public jail and penitentiary at six years. He thereupon moved the Court to set aside the verdict and grant him a new trial. His motion was overruled; and judgment rendered on the verdict; and he took a bill of exceptions to the opinion and judgment of the Court overruling his motion. The bill of exceptions sealed by the Judge sets forth the evidence offered in support of the motion, consisting of ex parte *640 affidavits and examinations in open Court of five of the • jurors who tried the cause, the two deputy sheriffs who had charge of the jury, and of other witnesses, together with a certificate by the Judge, of all the facts proved on tjle tr¡ai pertinent to the question of guilt or innocence, as well as all collateral facts supposed to have a bearing on the motion for a new trial. At the last term of the Court a writ of error was awarded on the petition of the prisoner, which has been elaborately argued at this; and the questions presented for adjudication carefully and maturely considered : And the result is a unanimous opinion of this Court, that there is no error in the judgment of the Circuit court. We proceed to state the grounds of that opinion as concisely as the number and importance of the points involved in our decision will permit.
The error assigned is, the refusal of the Circuit court to award a new trial. It does not appear from the record, upon what grounds the new trial was asked in the Court below: the grounds and reasons stated in the prisoner’s petition and assignment of errors, are: 1st. “ That additional evidence had been discovered since the trial which tended to shew that the witness for the Commonwealth upon whose testimony the prosecution rested, was unworthy of credit or belief. 2d. Upon the ground that the venire facias which issued in this case was improperly returned and executed: two or more of the said venire not being qualified as the law requires. Bd. That there was irregularity in the conduct of the jury who tried the case, in this, that they separated after retiring from the bar and before the rendition of their verdict, and escaped from the custody of the sheriffs who had them in charge, and conversed with bystanders and persons not members of said' jury. 4th. That there was misconduct of the said jury in this, that after retiring from the bar to consider of their verdict they the said jury founded their *641 verdict, not upon any principles known to or recognized by the law, but upon an arbitrary arithmetical calculation or process which was equivalent to the casting of lots, and to the result of which the said jury first bound themselves by a precedent agreement.” To these the prisoner’s counsel suggested, ore terms at the bar, additional specifications of irregularity and misconduct in the jury, that is to say: 1st, misbehaviour or misconduct in partaking of ardent spirits at all during the time they were enclosed and charged with the case of the prisoner; and the more especially in partaking of spirits furnished as a treat by Doctor L. R. Waring, a professional witness of the Commonwealth; and 2dly. that the visit of the jury on the morning of the 19th April, in company with the deputy sheriffs, their keepers, to the county of Chesterfield amounted in contemplation of law, to a discharge or escape of the whole jury, or if not, that going out of their county with the jury, if it did not put an end to the duties, powers and functions of the deputies in relation to the care and custody of the jury, at least suspended them for the time being; so that for the period of time during which the jurors remained in the county of Chesterfield they were under the care and in the keeping of unsworn officers.
Upon the first and second grounds stated as sufficient causes for setting aside the verdict, but little need be said. As to the first, it is well settled upon reason and authority both in civil and criminal cases, that after-discovered evidence in order to afford proper ground for a new trial, must be such as reasonable diligence on the part of the party offering it, could not have secured at the former trial: must be material in its object, and not merely cumulative and corroborative or collateral; and must be such as ought to be decisive, and productive, on another trial, of an opposite result on the merits. And furthermore, when the sole object and purpose of *642 the new evidence is to discredit a witness on the opposite side, the general rule is, subject to rare exceptions, to refuse a new trial. These rules are for obvious reasons applied with even more stringency to criminal than civil cases. This case is wanting in most if not all of these pre-requisites of a new trial, and is certainly not entitled to any exemption from the general rule which interdicts it where the sole object is to impeach or discredit a witness on the opposite side. See Wharton’s American Criminal Law at page 663, and the numerous authorities there cited.
As to the second ground, suffice it to remark there is no evidence of the existence of the fact, the disqualifition of the veniremen, upon which it is predicated. It is not very obvious from the terms of the sentence, “ that the venire facias was improperly returned and executed, two or more of the said venire not being qualified as the law requires,” whether the objection is to the twenty-four first summoned, or the second venire which issued after exhausting the first, or the venire of twelve who were elected, tried and sworn; but whether to the one or the other, even though the disqualification appeared in the record, the objection comes too late when taken for the first time after the jury is sworn to try the issue. Code of Virginia 1849, p. 628, ch. 162, $ 4.
Third. Separation of the jury. The only evidence of actual separation is that of the juror Stubbs, who swore that on the morning of the 19th of April, before the rest of the jury had risen, he rose, dressed himself and went down stairs to the pavement before the door of the hotel, for the purpose of meeting with a passer-by to send a message to his family; and after remaining there about five minutes and seeing no one passing he returned to the rest of the jury. To hold that such a separation as this, proved only by the evidence of the absenting juror, and who at the same time *643 proves that he saw and conversed with no one, and by his oath positively negatives all abuse, tampering or improper influence, leaving no room for presumptions, probabilities or possibilities even, would be to establish it as the law, that a separation per se and irrespective of circumstances, however temporary, innocent or inadvertent, and however exempt from any presumption or probability of tampering, abuse or undue influence, is sufficient to vitiate a verdict. In support of that proposition, the counsel for the prisoner cited McCaul's Case, 1 Va. Cas. 271; Kennedy's Case, 2 Va. Cas. 510; Thomas's Case, Ibid. 479; Overbee's Case, 1 Rob. R. 756; Howle's adm'r v. Dunn & Co., 1 Leigh 455; and McCann jr. v. The State of Mississippi, 9 Smead & Marsh. 465. In opposition to it, the attorney general has cited and relied upon Martin's Case, 2 Leigh 745; McCarter's Case, 11 Leigh 633; Tooel's Case, Idem. 714; and the cases of Thomas and Kennedy, cited by the prisoner’s counsel. McCaul's Case and Overbee's are the only Virginia cases cited for the prisoner, that go to the length of sustaining the proposition, or approximate it, (if indeed even they do so,) whilst the cases of Martin, McCarter and Tooel have countenanced a less rigid, and in our opinion more reasonable rule. The truth is, since criminal trials have become so much more protracted than formerly, and consequently the juries by reason of their frequent adjournments and long confinements, so much the more frequently and longer withdrawn from the supervision of the Court, and so much the more exposed to such irregularities as this, some relaxation of such a rule as is contended for, if clearly established by authority, would seem to be called for: otherwise frequent miscarriages or mistrials must inevitably occur, when there is not the lightest presumption or probability or even possibility of injury or injustice to the prisoner. But this case is distin *644 guishable from McCaul's and Overbee’s in the character aad circumstances of the separation and absence of the jurors; and in a more important point still, in this, ^at whilst in those cases the separation was proved by other witnesses, in this it is proved by the juror alone, as a witness of the prisoner, who in the same breath, negatives communication or conversation with any one ; and by consequence not only negatives the presumption or probability, but even possibility, of tampering or abuse of any kind. It is not necessary therefore to overrule those cases in order to sustain this verdict. It will be time enough to decide whether or not they shall stand when a case similar in all respects shall arise. When it does, if those cases shall be interpreted to have decided that a separation per se will vitiate a verdict, there will be against them and in the one scale reason, an unwavering current of English authority, ancient and modern, the overwhelming weight of American authority from our sister states, with the Virginia adjudications before referred to; and in the other, only the argument of the stare decisis.
In the next place it has been argued, if Stubbs’s temporary absence from the jury be not a separation fatal to the verdict, that the jury were not kept together and enclosed as required by law; that lodging them apart, distributed in five different rooms in the third story of the hotel, opening upon a common passage, which communicated with the street below by flights of stairs, the doors of their chambers being unlocked during the night, and there being no doors or other fastenings at either end of the passage or at both ends, (as in Kennedy’s Case,) amounts to or is equivalent to a separation in contemplation of law: not that the jurors did in fact leave their lodgings and separate by going elsewhere out of the hotel, but that they might have done so if they had been so minded, in disregard of their duty and the injunctions of their keepers and of the *645 Court. If by keeping together and enclosing, it be meant that jurors must be so kept and enclosed as to render separation and improper communication and conversation impossible, in many, if not in all cases, it would scarcely be within the compass of possibility, without resorting to the securities afforded by the four walls and the locks and bars of a prison and a prison guard in addition. Such rigour as this or any thing approximating it, would no more be tolerated now than the practice which prevailed in the olden time of keeping juries together “ without meat or drink, fire or candle,or holding them in duress and carting them around the circuit, until they should agree in a verdict. They are now, instead of being dealt with and treated as anciently very like prisoners and culprits, entitled by law whilst engaged in the performance of their necessary and important, but at the same time gratuitous and onerous duties, to needful and reasonable refreshments, and to have their comforts and convenience provided for and consulted, so far as is compatible with those salutary precautions, safeguards and restraints deemed conducive to the pure and impartial administration of justice. One of these is that in criminal cases they shall be kept together and enclosed in the custody or under the guardianship of the sheriff or his deputies. In Kennedy’s Case it was held a sufficient compliance with this requirement when they were kept in the same number of rooms and similarly situated in all respects as in this case, save only that in Kennedy’s Case there were at both ends of the passage doors which were constantly kept closed and fastened; whereas in this, there were no doors or other fastening at either end of the passage whereby it could be made secure from intrusion. Now we readily concede, when it is practicable it is preferable to have the jury lodged together in the same room, and on the circuit it is the practice of some of us always so to direct, if it be practicable; and it must be con *646 ceded that in Kennedy's Case there was a very near approximation to it, if it was not tantamount to keeping them in the same room. But shall we therefore hold that it was indispensably and absolutely necessary in a case wherein we are certified by the oath of the deputy sheriffs that such accommodations could not be procured at any hotel in the city of Richmond? We think not. The officer swears he procured the most convenient and suitable accommodation for the purpose the city afforded. He did all that was practicable ; and we think that satisfied the requirements of the law; and in consideration of the circumstance that the jury Avere lodged in the third story of a large hotel, in the heart of a populous city, and the consequent peril from fire from being so situated, it was but reasonable so far to respect their fears and apprehensions as to leave the doors of their chambers unlocked during the hours of the night. Our opinion is therefore, that the jury in this case Avas substantially kept and enclosed as required by law.
The last ground or allegation of separation is predicated upon the visit of the jury accompanied by the sheriffs across the river to the county of Chesterfield, on the morning of the 19th of April, before the meeting of the Court. It is not denied but that the object of this excursion Avas innocent and legitimate, relaxation and exercise; and it is not pretended that it was attended with any irregularity such as actual separation, conversation or communication with any one. Doubtless neither jurors nor the deputies dreamed of any impropriety or violation of law and duty in crossing over the boundary line between the two counties, any more than if for a like object they had been travelling in any other direction in the county of Henrico. But it is argued the moment the deputies crossed into Chesterfield by going beyond their territorial jurisdiction, their powers, duties and functions of sheriff ipso *647 facto ceased, their oath to keep the jury was cancelled, and by consequence, there was a constructive dissolution, discharge or escape of the jury; or if not, that they were for the time during which they remained in Chesterfield, in the custody or charge of unsworn officers; which is equivalent to a separation, or amounts to a constructive separation of the jury. It was not assumed as a proposition in the argument that the jury, by passing the limits of their county, was ipso facto discharged or dissolved: That such could not be the consequence of such an act, might be safely affirmed, because of the total absence of a reason for such a rule of law. But if authority and precedent were necessary on such a point, it is furnished by the ancient practice of the English Judges, of carting disagreeing juries around the circuit from county to county to coerce a verdict. Nor can we very well comprehend how it would determine the powers, functions and duties of the sheriff quoad hoc; or how it could absolve him from or cancel his oath to keep them. The most that could be urged with any degree of plausibility, is that if the jury had chosen to separate or escape, the officers might not have had the power whilst out of their own county to prevent it; but the answer to such an argument is they did not so choose. Neither the jurors nor the officers could have dreamed there was any the least interruption or suspension of their respective functions and duties occasioned by an innocent promenade ; nor was there in our opinion any. Nor can we very well comprehend the idea of a constructive discharge of the jury, effected by a constructive abrogation of the sheriff’s powers, and constructive cancellation of his oath. But we can understand what is meant by the constructive escape of a prisoner arrested under a ca. sa. by the sheriff’s carrying him out of his county or jurisdiction, and the reason upon which the doctrine is founded : and it is to be presumed it was a fanciful or *648 forced analogy between the two cases which suggested this point to the prisoner’s counsel; and he has laboured for the purpose, if successful in maintaining it, of bringing this case within the influence of the decision of McCann jr. v. The State of Mississippi, 9 Smead & Marsh. 465, wherein it was ruled “ that where a jury on a trial for murder, were during a portion of the trial in the charge of an unsworn officer, and after the retirement of the jury were for a long time wholly under his charge; and nothing whatever appeared as to his conduct towards the jury nor as to their demeanour, and the jury afterwards found the prisoner guilty of murder, the verdict must be set aside.” This case has no bearing on ours ; certainly none favourable to the prisoner’s cause, if the analogy fails, as in our opinion it manifestly does, but on the contrary it sustains the opinion of the Court. It appears from it that in Mississippi the sheriff is authorized to employ bailiffs to take charge of juries in criminal cases, but before he is qualified to act he must either take an oath to keep the jury in each particular case, or a general oath to keep all juries that may be committed to him during the term; whilst with us the sheriff1 or his deputies are ex officio the lawful keepers, charged under the sanctions of their official oath, to the performance of that duty, and though it is our practice and one to be commended, out of abundant caution, and because it reminds the jury and the officer of his and their duty, at each adjournment of the jury to repeat the oath, it has been held by this Court not to be indispensably necessary. In the case of McCann jr. before cited, the bailiff (as proved by himself, and his was the only affidavit, and this the only fact proved on the record,) supposing the warrant of his appointment by the sheriff sufficient authority for him, failed to take any oath either general or special: and the consequence of that failure was to vitiate the verdict as before mentioned, *649 and the operative reasons for this decision, it is manifest from the opinion of the Court were, that nothing whatever appeared as to the conduct of the officer towards the jury and as to their demeanour, leaving the adverse presumption of sinister influence to arise, spoken of in another part of the opinion, where it is laid down that if “a jury in a criminal case, or any portion of it, have been exposed to undue influence either by the whole jury being under the charge of an unsworn officer, and any of the jury have separated from the rest, and had intercourse or opportunity of intercourse with third persons, and it does not affirmatively appear that no consequences were effected upon the jury by such exposure, and the prossibility of undue influence be not wholly negatived, the verdict of such jury will be set aside. It seems, however, said the Court, to be otherwise if the record shewed that no undue influence had been exerted or attempted.” If we are right in assuming that no separation but Stubbs’s temporary absence, is proved in this case, and that he as the prisoner’s own witness, has wholly negatived all undue influence either attempted or exerted, this may be well claimed as authority to sustain the opinion of the Court, but not the cause of the prisoner.
Having disposed of the question of the separation, let us proceed to the consideration of another species of irregularity upon which in the prisoner’s petition and assignment of errors he predicates his fourth ground of objection to or cause for setting aside the verdict, viz :
Misbehaviour or misconduct of the jury. This objection is of a threefold character. 1st. To the mode adopted for taking the sense of the jury and arriving at or making up their verdict. 2d. Because on the night of the 18th and morning of the 19th of April, some of the jurors partook of ardent spirits. 3d. Because the ardent spirits of which they partook on the night of the 18th was furnished at the cost of Dr. *650 Waring who had been examined by the Commonwealth as an expert or professional witness in the cause.
1st. As to the mode by which the jury arrived at a verdict. The evidence on this point consists of the depositions of five of the jurors. We waive the consideration and decision of the preliminary question discussed at the bar, as to the competency of the evidence of jurors to impeach or invalidate their own verdict : and we purposely abstain, (it not being necessary in our view of this case to decide it,) because of the gravity and importance of the question; and because it has never yet been so maturely considered and solemnly adjudged in Virginia in any case brought to our attention, as to render it a settled question in causes either civil or criminal. The question is now well settled in England against the competency, and the great preponderance of American authority is the same way: And Chief Justice Hosmer, 5 Conn. R. 348, said, “ The opinion of almost the whole legal world is adverse to the reception of such testimony, and in my opinion on invincible foundations.” But proceeding upon the hypothesis of its competency, let us see if the evidence of the jurors be sufficient to establish misbehaviour or misconduct, and not only so, but such misbehaviour as will vitiate their verdict: for it must be borne in mind, in considering every branch of this enquiry as to irregularity or misbehaviour, that many irregularities or species of misconduct may intervene in the progress of a trial, which may expose juries or others to the penalties of a misdemeanor or contempt, and yet be insufficient per se to disturb the verdict. By far the greater part of irregularities and misbehaviours are of this character, where it appears they could have had no sinister influence upon the verdict, affecting its integrity, purity and impartiality.
*651 Unquestionably every verdict, whether in a civil or criminal case, but more especially in a criminal case, should be the result of reason, deliberation and honest conviction, and not the offspring of chance or accident. If a jury therefore, should so far forget a sense of duty and the obligations of their oath, as to determine their verdict by casting of lots, whether for whom to find or the measure of damage, or degree of guilt and quantum of punishment, as the case may be, there is no doubt upon reason or authority, as to the right and duty of the Court to set aside the verdict, and award a new trial, if the fact be established to its satisfaction by competent testimony. But on the other hand when a jury has deliberated and made up and returned their unanimous verdict, a verdict neither in conflict with the law or the evidence, it is due alike to public and private interests, and to the sanctity of and a becoming respect for the jury trial, that Courts should not Upon trivial grounds interfere or meddle with that verdict. The power to award new trials should be exercised with caution and circumspection, and only for good and sufficient cause. It is certainly a desideratum both to the parties and to the public that juries should agree upon their verdicts if possible, and as speedily as practicable. “ Exp edit reipublicce ut sit finis litium” is as applicable to a protracted continuing as to the renewal or repetition of it when once determined, differing, if differing at all, not in the principle but the degree. So expedient was it deemed in the early periods of English jurisprudence, that consent in a verdict was even extorted from the jury under the pains and penalties of hunger and thirst and other privations, and of being carted around the circuit with the Judge, and held in a sort of duress, until they agreed. If it be sound policy to end litigation by the rendition of a verdict as soon as practicable, consistently with the purity, impartiality and integrity of the jury trial, though we may very properly nullify a ver *652 diet which was the result of a lottery, we should certainly be running counter to that policy, to place a verdict like this in the same category. There is no real analogy between the two cases: or if any but seeming and remote. One thing is certain, as the experience of every one conversant with trials will attest, in some cases, and these not a few, we have to choose between the alternatives of tolerating the practice resorted to by the jury in this case, and the indefinite postponement of a verdict. If every juryman is to adhere pertinaciously to his own judgment regardless of the opinions of his fellows, especially upon the question of measure of damage or degree of guilt or quantum of punishment; if jurors are denied the privilige of harmonizing discording and reconciling extreme opinions by concession and compromise, and meeting on middle ground, a failure of justice, or what is tantamount, indefinite delay, is the inevitable consequence. What more we would ask, have the jury done in this case, than what we know is of every day occurrence in trials in Courts of equity, where when a question of damage or value or compensation arises before the master, and when witnesses of equal credibility, or integrity and intelligence, differ in their estimates, the master adopts as his assessment an average of the estimates of such witnesses; and this practice is sanctioned by a Court of equity, which is a Court of conscience, as it is by law and justice. Indeed in some cases it may be considered a rule of necessity as well as convenience. Would it not be an anomaly, an inconsistency in our jurisprudence, amounting almost to an absurdity, to hold that a commissioner in chancery may thus perform a duty in its nature judicial, with the approval of the Chancellor, whilst for so doing the same duty in the same way the verdict of a jury is to be set aside by the Court of law. Why may not the jury deal with the estimates of each other which must be presumed to be honest and bona fide, *653 until the contrary is proved, as does the master in chaneery with the differing estimates of witnesses equally entitled to credence. We do not mean to say it is the bounden duty of the jurors in all or any cases to adopt such a rule, that is a question to be settled by their own consciences. It is for each to determine for himself according to the intensity of his own convictions, the greater or less confidence he may entertain in the absolute cbrrectness of his own standard of right, or in the infallibility of his own judgment, how far he can conscientiously yield and surrender up his own in deference to the conflicting opinions and judgments of his fellow jurors. That the jury have done nothing more in this case, than, after first deciding the question of guilt, to adopt as their verdict as to the quantum of punishment, the average of their assessments, we consider substantially proved by the two dissentient jurors, (we mean dis-sentient upon the question of guilt when the jury first retired, Peay and Stubbs, upon whom the prisoner’s counsel mainly, if not exclusively, relied to prove misconduct. Stubbs it seems gave one deposition and Peay three, the first an ex parte affidavit out of Court, the second and third upon examinations in open Court. We have deemed it unnecessary to analyse critically their statements, or to advert particularly or in detail to the confusion which pervades them, and the discrepancies between the several statements of Peay, especially between the third and the two first, because if there were any doubt upon their evidence as to what transpired in the jury room, the depositions of three other jurors, Blair, James and Ball, called and examined at the instance of the Court, and who if not more honest, appear from their examinations to be certainly more intelligent than the two first named, relieve the question of fact of all doubt and difficulty. From these concurring statements it appears when the jury first retired, the question of guilt or innocence was formally taken; *654 there is a diversity of recollection as to the number for acquittal, it was either two, three or four, the probability is in favour of two; of those for conviction one was for murder in the first degree, the rest for a lower grade of homicide, murder in the second degree, and it may be some for manslaughter; though that does not clearly appear. After conference and discussion among the jurors upon the main question of guilt or innocence, according to the explicit and concurring evidence of these three jurors, all the jurors consented to find the prisoner guilty ,• and then arose the question of the degree of guilt and the quantum of punishment. It seems that no formal question was taken as to the degree of homicide; but it being understood that the juror who was for hanging was willing to come to those in favour of a lower grade of of-fence, and below a capital felony, they proceeded at once to the enquiry as to the term of imprisonment. It was proposed that it should be ascertained by each juror setting down the number of years he thought the offence merited, adding these numbers, dividing the aggregate by twelve, and adopting the quotient for their verdict. If in this process each and every juror fairly and bona fide set down a number of years within the minimum and maximum prescribed by law to the degree of guilt, in his judgment commensurate to the of-fence, the same process would ascertain as well the degree of guilt as the measure of punishment, and render-unnecessary the formal decision of the preliminary question as to the degree of homicide; for it was substantially decided by the length of the term of imprisonment being over five years the maximum of manslaughter, it was murder in the second degree, and so they all understood it, as all who have been examined expressly state. We are told by James that the proposition to set down, add up and divide by twelve was not a precedent agreement binding the jury to acquiesce in the result of the experiment. That two calculations were *655 in fact made; the first by way of mere experiment to see how near the result would come to satisfying all. That when the last was made, he added up the estimates of the other eleven before setting down his own, in order to ascertain what number he should set down to produce the result or the nearest practicable approximation to it, his conscience approved. He thought six years the proper term of imprisonment, but he set down one year to reduce the average to six years or thereabouts. If by adding up the eleven numbers before setting down his own he thus acquired an advantage over his fellows, the prisoner surely has no cause to complain, since it was used not to his injury but in his favour. When the second and last estimate was made which resulted in six years and some months, Peay and Stubbs expressed some dissatisfaction with the result: The odd months were then stricken off and they acquiesced in the verdict for six years. They both say they consented to it in the jury room, and afterwards in open Court, with a perfect knowledge of the character and effect of the verdict; that it was murder in the second degree, and for six years imprisonment; and this freely and voluntarily without any undue influence from any quarter. It has been well remarked by a learned Judge that the law requires jurors to unite in their verdict, but not in their reasons or motives. Establish it as the law that the jury room may be invaded, an inquisition held over the consciences of jurors, an enquiry instituted into their deliberations in order to find matter of impeachment in the mental processes by which they arrived at their conclusions and results, and the mutual concessions and compromises or other means by which they were enabled to reconcile conflicting opinions and meet on middle ground, and then hold that the mode adopted by this jury in arriving at their verdict was illegal and sufficient to vitiate it, and few verdicts will henceforth stand the test of such a scrutiny. In sup *656 port of our opinion on this point we cite Shobe v. Bell, 1 Rand. 39; Price v. Warren, 1 Hen. & Munf. 385; Cowperthwaite v. Jones, 2 Dall. R. 56 ; and Grinnell v. Phillips, 1 Mass. R. 542. The two last are persuasive authorities. The reasons of the Judges who delivered the opinions in these cases are so pertinent to the question under consideration, we conclude this part of our opinion with a quotation from both. In the case in Dallas, Shippen, President, said, “ The first objection as to the manner of the jury collecting the sense of its members with regard to the quantum of damages, does not appear to us to be well founded, or at all similar to casting of lots for a verdict. In torts and other cases where there is no ascertained demand it can seldom happen that jurymen will at once agree upon a precise sum to be given in damages: There will necessarily arise a variety of opinions, and mutual concessions must be expected. A middle sum may in many cases be a good rule, and though it is possible this mode may sometimes be abused by a designing juryman fixing upon an extravagantly high or low sum, yet unless such abuse appears the fraudulent design will not be presumed.” And in that from 1 Mass. R. 542, Sewell, Justice, said, “The record of a verdict implies an unanimous consent of the jury, and is conclusive and incontrovertible evidence of the fact. Besides, the secret intention and mental act of a juror can never be a subject of legal enquiry, and from the necessity of the case his conduct before the Court is the best and only evidence that can be admitted of his assent to a verdict delivered in his presence. The members of a jury before they agree must argue the questions of the case committed to them, and each may be supposed to express his opinion as to the general question for which party the verdict shall be found, and if for the plaintiff for what amount of damages. It is not important as it seems to me by what method a sum for damages shall *657 be proposed, if finally there is unanimous assent of the jury in the sum declared by their verdict.” It is true these were civil cases and ours is a criminal one; but we can perceive no reason why that difference should weaken the analogy or detract from their influence or bearing in the least.
We will now briefly consider together the second and third specifications of misconduct or misbehaviour in the jury for partaking of ardent spirits at all, and for partaking of the treat furnished by Dr. Waring. In support of these objections the prisoner’s counsel cited the Code 629, ch. 163, § 12. People v. Douglass, 4 Cow. R. 26 ; Oliver v. Trustees of Springfield, 5 Cow. R. 283 ; Bryant v. Forster, 7 Conn. R. 562; and Coleman v. Moody, 4 Hen. 6c Munf. 1. And the attorney general relied on 21 Viner Abr. 447-8, title Trial, letter g; 2 Hale P. C. 306; Commonwealth v. Roby, 12 Pick. R. 496; Everett v. Youells, 24 Eng. C. L. R. 142; and 3 Rob. Pr. 247-8. According to the English authorities the only question ever made on the subject of refreshments in eating and drinking has been, by whom furnished ? and not as to the kind : and they have holden that if furnished by a party, or the prevailing party in a cause, it is sufficient ground for setting aside the verdict; but if furnished at the cost of the jury or a third party a stranger in interest to the cause, whilst it might constitute misbehaviour and subject him to fine and imprisonment for the irregularity, it would not affect the validity of the verdict; unless in addition to the mere irregularity it was attended with such circumstances of excess, abuse or otherwise as to create a reasonable presumption that it injuriously influenced the impartiality and purity of the verdict: And there is no Virginia authority that lays down a different rule and countenances the proposition that the fact of ardent spirits entering into and forming part of the refreshments, if used with moderation and tempe *658 ranee, constituted misconduct in a jury; and if misa conduct for which the jury might be fined, such an irregularity as to vitiate the verdict. The case of Coleman v. Moody, cited for that purpose, is not only not authority for such a proposition, but if not expressly, by strong implication decides the contrary. Nor do we consider the New York adjudications referred to as clearly establishing such a rule; though it must be confessed that some of the dicta of the Judges in those cases go to that extreme. In the case of The People v. Douglass, the decision was “ when the jury separate contrary to the instruction of the Court, make use of strong drink, and converse upon the matter they are empanneled to tryand this it appears was whilst they were sitting as a jury and during the progress of the trial. But even in that case the rule is laid down, that the mere separation of a jury without farther abuse is not sufficient ground of new trial, and that it' is not every irregularity that will render a verdict void. Bryant v. Forster was a case where a juryman while engaged in the course of a cause, was permitted to leave the Court in charge of an officer, and who improperly separated himself from that officer and drank about one third of a gill of brandy. The Court said, “ We cannot allow jurors thus of their own head to drink spirituous liquors while engaged in the course of a cause.”
But grant that the New York cases cited from Co wen have firmly settled the law in that state as contended ; whilst it is admitted they are entitled to the most respectful consideration on account of the high character of the tribunal and the learning and ability of the Judges whose reasoned opinions they contain, and always proper to be consulted as lights to inform and guide our deliberations, and weighed, adopted and followed so far as they persuade and convince, they cannot bind this Court as authority. And not being so bound, we must say, with all due respect, they have *659 not convinced our judgment and cannot receive our • approval. We find the law laid down on this subject far more to our satisfaction in a case in 6 Greenleaf 37, in the following terms : “ If ardent spirits constitute part of the refreshments and appear to have operated upon any juror so far as to impair his reasoning powers, inflame his passions or have any improper influence upon his opinions, the verdict would probably be set aside;” and in choosing between the New York and Massachusetts decisions on this point, we have no hesitation in preferring the latter as the most reasonable. In times past when criminal trials were more summary, when they were generally decided in a day or at a sitting, when all refreshments were withheld until a verdict was rendered, it might have been a very wise and proper precaution and one productive of but little if any hardship or inconvenience, certainly no more than the deprivation of other refreshments, to deny even the moderate and temperate use of ardent spirits whilst they were engaged in Court sitting as a jury, or retired to their jury room to deliberate and consult of their verdict; but now when trials are protracted and spun out for successive days and sometimes weeks, and since the law has provided that reasonable refreshments shall be furnished at the public expense, we do not know where this Court will find its authority for imposing upon jurors the interdict of total abstinence during their confinement. It has the undoubted right and it is its bounden duty to require of those who are not given to total abstinence the strictest moderation and temperance in the use of ardent spirits, and to hold them, their keepers, and those who supply them, responsible criminaliter as for a contempt, for any abuse or excess of indulgence; but in our judgment, however much we may approve and commend total abstinence in all, and on all occasions, and more especially on such an occasion as that of being engaged in performing the *660 grave duty of a juror, deliberating upon an issue in-solving the life or liberty of a fellow being, we neither can nor ought, if we could, go farther. It is the right of jurors to be permitted to exercise the discretion and free will on the subject which belong to them out of the jury box ; and ours both the right and the duty of holding them responsible to strict accountability for any abuse or excess: and when there is reason to suspect that such excess or abuse has exerted a sinister influence, of annulling their verdict and awarding a new trial.
The only remaining question is, whether the well-intended but thoughtless and ill-timed act of civility and hospitality on the part of the Commonwealth’s witness, Dr. Waring, in treating the jury on the night of the 18th of April, (in the presence of the officers who had them in charge, be it remembered,) shall vitiate this verdict. That the act was mere inadvertence, and the intent innocent, cannot be questioned, from aught that appears in this record to the contrary. His being there was purely accidental, as appears from the deposition of the deputy sheriff: He went upon his invitation. He had no interest in the cause, and no connection with it, except as a professional witness for the Commonwealth. It does not appear that he was hostile to the prisoner, or even knew him, or desired his conviction; it does not appear that there was the least question as to his credibility ; but the contrary is fairly inferrible from the record. That it was an irregularity, is not denied, in the witness, the jurors and the officers permitting it; but one, which though brought to the attention of the Court who presided over the trial, so far as appears from the record, passed without its animadversion, doubtless because of the absence of intention on the part of all concerned to commit any breach of duty or propriety. It cannot reasonably be presumed or suspected that any injury to the prisoner has resulted from the inadver *661 tence. The jury, as we are certified by the Judge aud the deputy sheriffs, were strictly temperate, a large proportion of them said to be Sons of Temperance ; they demeaned themselves with the most exemplary propriety during the whole trial, and have rendered a verdict unimpeached and unimpeachable upon the merits, according to the law and the evidence, and of which, if any error could be predicated, it would be an error on the side of humanity and mercy. To set aside such a verdict for such an irregularity, would, in our judgments, establish a precedent in our criminal jurisprudence much to be deprecated, because calculated to multiply miscarriages in criminal trials, and impediments in the way of the conviction and punishment of offenders, already sufficiently numerous and embarrassing.
Judgment affirmed.